**In re GOLDEN MANE ACQUISITIONS, INC., Debtor.**

**Golden Mane Acquisitions, Inc., Plaintiff,**

**v.**

**100 Wall Street Associates; Arthur Bienenstock; and Arthur G. Cohen as General Partners, Defendants.**

**Bankruptcy No. 96–08754–BGC–11. Adversary No. 97–00410.**

United States Bankruptcy Court, N.D. Alabama, Southern Division.

June 1, 1999.

Eric Breithaupt, Birmingham, Alabama, for plaintiff/debtor.

William Ratliff, Birmingham, Alabama, for defendants.

## MEMORANDUM OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

BENJAMIN COHEN, Bankruptcy Judge.

The plaintiff is suing the defendants for reimbursement of funds it paid for property taxes that accrued during the period the property was owned by one of the defendants, 100 Wall Street Associates.

Mr. Eric J. Breithaupt, the attorney for the plaintiff and Mr. William Ratliff, the attorney for the defendants, appeared at a scheduling conference held on April 20, 1998. At that conference, the parties agreed to file a joint stipulation of facts and cross motions for summary judgment, and to submit the issues on those pleadings. Shortly thereafter, the parties filed their motions and the *Summary Judgment Stipulation.* In addition, each party filed an affidavit. The joint stipulation consisted of copies of 19 separate documents.[1] The plaintiff's affidavit was that of Eric J. Breithaupt, the plaintiff's attorney, who also acted as auctioneer for the sale of the subject property at a foreclosure. The defendants' affidavit was that of Mr. Arthur Bienenstock, one of the general partners of the defendant, 100 Wall Street Associates. Both parties filed legal arguments.

A status hearing was held on November 9, 1998. Mr. Breithaupt and Mr. Ratliff appeared and presented oral arguments. Written communications and other informal conferences were held in an attempt to narrow the issues and define the facts. All matters were taken under advisement on February 5, 1999.

The matters now before the Court are the cross motions for summary judgment in the form of the plaintiff's *Motion for Summary Judgment* and the *Defendants' Motion for Summary Judgment.* After consideration of those motions, the joint stipulation of the parties', the documents attached to the stipulation, the affidavits, the pleadings on file, the record in this case, and the briefs and oral arguments of counsel, the Court finds that there are no genuine issues as to any material facts and that, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure (applicable to these matters by Rule 7056 of the Federal Rules of Bankruptcy Procedure) the defen-

---

1. The stipulation expresses the agreement of the parties to the authenticity and admissibility of the attached documents, but does not contain any independent agreed upon statement of facts.

dants are entitled to judgment as a matter of law.

## I. Findings of Fact

The property generating the tax liability is a parcel of land in Birmingham, Alabama occupied by a high-rise office building.

Prior to construction of the office building, B.S.T. Corporation (hereinafter "BST") owned the unimproved property. BST leased the unimproved property to Morris Avenue Corporation (hereinafter "MAC"). MAC borrowed approximately five million dollars from New York Life Insurance Company (hereinafter "NYL-IC") to build the office building. To secure the loan, both BST and MAC granted NYLIC a mortgage lien on BST's fee simple interest in the property and MAC's leasehold estate. The mortgage deed executed by BST and MAC in favor of NYL-IC provides, in relevant part:

And Mortgagor covenants with Mortgagee that it is lawfully seized of a leasehold estate in and to Tract I of the property hereinabove described and is lawfully seized in fee of Tract II above described, and B.S.T. Corporation covenants that it is seized in fee of Tract I of the property above described subject only to the said leasehold estate owned by Mortgagor, and Mortgagor and B.S.T. Corporation covenant that they have a good right to sell and convey the same as aforesaid; that the said premises are free of all encumbrances except above set out and the leases executed by Mortgagor with tenants that occupy space in the building on the mortgaged premises and which are described in an assignment of leases executed by Mortgagor in favor of Mortgagee and delivered contemporaneously herewith, and that they will warrant and forever defend the title to said premises unto Mortgagee, its successors and assigns, against the lawful claims of all persons whomsoever.

This mortgage is made and accepted on the understanding that the following covenants, conditions and agreements shall continue in effect so long as any portion of the indebtedness hereby secured remains unpaid, to-wit:

. . . .

(3) That said premises and the improvements thereon shall be kept in good condition and no waste committed or permitted thereon, natural wear and tear excepted, and all taxes and assessments or other charges which may be levied upon or accrue against said premises, as well as all other sums which may be or become liens or charges against same, shall be paid and discharged by Mortgagor promptly as and when so levied or assessed, and shall not be permitted to become delinquent or to take priority over the lien of this mortgage.

. . . .

(7) If Mortgagor fails to insure said property as hereinabove provided, or to pay all or any part of the taxes or assessments levied, accrued or assessed upon or against said property or the indebtedness secured thereby, or any interest of the Mortgagee in either, or fails to pay immediately and discharge any and all liens, debts, and/or charges which might become liens superior to the lien of this mortgage, Mortgagee may, at its option, insure said property and/or pay said taxes, assessments, debts, liens, and/or charges, and any money which Mortgagee shall have so paid or become obligated to pay shall constitute a debt to Mortgagee additional to the debt hereby specifically secured, shall be secured by this mortgage, shall bear legal interest from the date paid or incurred and, at the option of the Mortgagee, shall be immediately due and payable.

Exhibit 3 to the joint *Summary Judgment Stipulation,* at pages 5, 7–8.

The mortgage deed was later amended by the parties to provide that the property subject to the mortgage would also secure a loan subsequently made by NYLIC to

MAC. Both the original mortgage instrument and the amended mortgage specifically provided that BST was not personally responsible for the sums borrowed by MAC from NYLIC.

The office building was constructed in 1962.

On December 13, 1973, BST quitclaimed its interest in the property to MAC. By warranty deed dated May 31, 1979, MAC transferred the property to Hexalon Real Estate, Inc. (hereinafter "Hexalon"), which, in turn, transferred the property by "Limited Warranty Deed" dated May 31, 1984, to the defendant, 100 Wall Street Associates (hereinafter "WSA"), a partnership. The defendants Arthur Bienenstock and Arthur G. Cohen are general partners in WSA.

The deed from Hexalon to WSA provides that Hexalon did "grant, bargain, transfer, exchange and convey...."the property to WSA, "[t]o have and to hold, to the said grantee, its successors and assigns forever," and further that:

> And said Grantor [Hexalon] does for itself, its successors and assigns, covenant with said Grantee [WSA], its heirs and assigns, that it is lawfully seized in fee simple of said premises, that they are free from all encumbrances except those described in Exhibit "B" attached hereto and incorporated herein, that it has a good right to convey the same as aforesaid, and that it will, and its successors and assigns shall, warrant and defend the same to the Grantee, its successors and assigns forever, against the lawful claims of all persons claiming by, through, or under Grantor.

Photocopy of "Limited Warranty Deed" attached to Exhibit 1 of *Defendants' Motion for Summary Judgment.*

The mortgage and amended mortgage from BST and MAC to NYLIC are described in "Exhibit B" referred to in the deed from Hexalon to WSA.

In his affidavit attached to the *Defendants' Motion for Summary Judgment,* Arthur Bienenstock states that he is a general partner of WSA, that WSA did not assume the mortgage indebtedness owed by MAC to NYLIC, and that WSA neither requested the plaintiff to pay real property taxes assessed against the property for the years 1992, 1993, and 1994, nor did it ratify the plaintiff's payment of those taxes.

On September 14, 1994, NYLIC assigned the note from MAC and the mortgage which secured that note, to a Mr. Glenn I. Mazer. That same date, Mr. Mazer assigned the note and mortgage to the plaintiff, Golden Mane Acquisitions, Inc.

On October 6, 1994, WSA transferred the property to South Wall Street Corporation (hereinafter "SWSC"). The deed from WSA to SWSC provides that WSA "does grant, bargain, sell and convey...."the property to SWSC, "[t]o have and to hold, to said South Wall Street Corporation, an Alabama Corporation heirs, assigns and successors forever," and further that:

> And said grantor [WSA] does for itself and for its successors, assigns, and partners with the said South Wall Street Corporation and its heirs, assigns and successors, that it is lawfully seized in fee simple of said premises; that they are free from all encumbrances except the mortgage recorded in Real Volume 366, Page 93, and amended in Real Volume 1374, Page 186 in the Probate Office of Jefferson County, Alabama, as assigned that it has a good right to sell and convey the same as aforesaid; that it will, and its assigns and successors and administrators shall, warrant and defend the same to said South Wall Street Corporation, an Alabama Corporation he is [sic], assigns and successors forever, against the lawful claims of all persons.

Exhibit 20 to Plaintiff's and Defendants' joint *Summary Judgment Stipulation,* pages 5, 7–8. The mortgage referred to in

the deed from WSA to SWSC is the mortgage from BST and MAC to NYLIC.

On January 27, 1995, the plaintiff, pursuant to the power of sale contained in the mortgage instrument, conducted a non-judicial foreclosure sale of the property in accordance with Alabama law. As of that date, the amount due under the mortgage, including principal and interest, fees and expenses, but excluding accrued but unpaid real estate taxes, was $1,523,756.12. The plaintiff bid that amount for the property and, being the high bidder, transferred title to the property to itself by foreclosure deed.

On the date of the foreclosure sale, real estate taxes totaling $178,064.31 for the years 1992, 1993, and 1994, had accrued but were unpaid. Subsequent to foreclosure, the plaintiff, on July 16, 1997, paid the tax debt on the property, which, by that time, had, because of the accrual of statutory interest, grown to $253,719.13.

## II. Contentions

The plaintiff contends generally that it is entitled to be reimbursed by the defendants for the sums paid by the plaintiff to satisfy the tax debt that accrued during the time the property was owned by WSA. The plaintiff contends specifically that:

1. WSA is required, by the terms of the mortgage instrument, to reimburse the plaintiff for sums paid to satisfy the tax debt;

2. WSA is required, because of covenants contained in the deed from WSA to SWSC, to reimburse the plaintiff for sums paid to satisfy the tax debt; and

3. Payment of the tax debt by the plaintiff created an implied contract between WSA and the plaintiff which requires WSA to reimburse the plaintiff for sums paid to satisfy the tax debt.

The plaintiff seeks recovery from the individual defendants only to the extent that they may be liable as general partners for the partnership debts of WSA.

The defendants deny any liability.

## III. Summary Judgment Standard

The standards for resolving issues within the context of a summary judgment motion are outlined in the Court of Appeals for the Eleventh Circuit decision in *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir.1993). This Court has followed and applied those standards in deciding the pending matters.[2]

---

2. Those standards are:

A. Introduction

Under Fed.R.Civ.P. 56(c), a moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The substantive law applicable to the case determines which facts are material. The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor.

In *Adickes v. Kress*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Supreme Court instructed the federal courts to employ a two-part framework of shifting burdens to determine whether, as regards a given material fact, there exists a genuine issue precluding summary judgment. The operation of this framework was modified significantly in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The current framework is set out below.

B. Movant's Initial Burden

The movant's initial burden consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. The nature of this responsibility varies, however, depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial.

1. For Issues on Which Movant Would Bear Burden of Proof at Trial

As interpreted by this court sitting en banc, *Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion

780

## IV. Conclusions of Law

### A. The Plaintiff's Contentions

#### 1. Reimbursement by Virtue of the Mortgage Instrument

 As to the plaintiff's first contention, the Court finds that reimbursement is not required by the mortgage instrument. WSA is not and has never been a party to either the note or the mortgage ultimately assigned to the plaintiff. And while both the deed from Hexalon to WSA, and the deed from WSA to SWSC, recognize the existence of NYLIC's mortgage lien on the property, and expressly make the transfers to WSA and SWSC subject to that mortgage lien, clearly they do not contain any language that attests either an intent on the part of WSA to assume the mortgage indebtedness owed by MAC to NYLIC or an assumption of that mortgage debt by WSA. Like the grantee in *Trauner v. Lowrey*, 369 So.2d 531, 534 (Ala.1979), WSA, as grantee of a conveyance made subject to a mortgage, "incurred no personal obligation to pay the mortgage, but ... had the privilege to do so to protect

with credible evidence that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

2. For Issues on Which Non–Movant Would Bear Burden of Proof at Trial

For issues, however, on which the non-movant would bear the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show, that is, point out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

C. Non–Movant's Responsibility Once Movant Satisfies Initial Burden

If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. If, however, the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.

1. For Issues on Which Movant Would Bear Burden of Proof at Trial

For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact. Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial—that is, such that no reasonable jury could find for the non-movant—should the movant be permitted to prevail without a full trial on the issues.

2. For Issues on Which Non–Movant Would Bear Burden of Proof at Trial

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was overlooked or ignored by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

2 F.3d at 1115–1117 (internal quotation marks, citations, footnotes, indentations, brackets, and ellipses have been omitted).

"[its] interest in the property." *Id.* (parenthetical added.)

The affidavit of Mr. Bienenstock is the only other evidence before the Court on the subject. That affidavit affirmatively proves that WSA did not assume the mortgage indebtedness, and is evidence that has neither been impeached nor contradicted by the plaintiff. Consequently, the Court must find that WSA did not assume the mortgage.

■ As to the specific question regarding payment of taxes, the mortgage deed from BST and MAC to NYLIC provides the mortgagee the right to pay taxes owed by the mortgagor and to obtain reimbursement of the taxes so paid as part of the mortgage debt. But that right of reimbursement may not be enforced against a purchaser of the property who did not agree to pay the debt secured by the mortgage. "As a general rule, a purchaser of mortgaged lands is not liable for the mortgage debt, unless he expressly or impliedly agrees to pay the same." *Interstate Land & Investment Co. v. Logan,* 196 Ala. 196, 200, 72 So. 36, 38 (1916). Since, according to the uncontradicted evidence submitted by the parties, WSA was not a party to the mortgage and did not agree to become personally liable for the mortgage debt, WSA cannot, by virtue of any provision of the mortgage instrument, be made personally liable to the plaintiff for the sums paid by the plaintiff to satisfy the tax debt on the property. See *Griffin Lumber Co. v. Neill,* 240 Ala. 573, 576, 200 So. 415, 417 (1941) (non–assuming grantee of mortgagor's equity of redemption has no duty to mortgagee to pay local street assessments even though mortgage instrument contained covenants requiring the payment of those assessments by the mortgagor).

**2. Reimbursement Required by Warranties or Covenants Made in the Deed from WSA to SWSC.**

■ As to the plaintiff's second contention, the Court finds that reimbursement is not required by any warranties or covenants made in the deed from WSA to SWSC. The covenants created in the language in the deed from WSA to SWSC are those of quiet enjoyment and warranty. *See St. Paul Title Ins. Corp. v. Owen,* 452 So.2d 482, 483 (Ala.1984); *Blaum v. May,* 245 Ala. 156, 16 So.2d 329 (1944); *Keel v. Ikard,* 222 Ala. 617, 133 So. 906, 907 (Ala. 1931). The nature of such covenants is discussed in the opinion of the Supreme Court of Alabama in *St. Paul Title Ins. Corp. v. Owen,* 452 So.2d 482 (Ala.1984). Writing for the Court, Justice Alva Hugh Maddox explained:

[C]ovenants of quiet enjoyment and warranty are said to operate in futuro for the benefit of the ultimate grantee. Until broken, these two covenants run with the land to the heirs of the grantee, or if the land is conveyed or assigned, to the assignee, so that when they are broken, the heir or assignee injured by the breach can maintain an action against the covenantor. Thus, it is generally recognized and held that when a covenant of title runs with the land, all grantors, back to and including the original grantor-covenantor, become liable upon a breach of the covenant to the assignee or grantee in possession or entitled to the possession at the time, and the latter may sue the original or remote grantor, regardless of whether he has taken from the immediate grantor with a warranty.

Because the covenants of quiet enjoyment and of warranty are virtually identical in operation, whatever constitutes a breach of one covenant is a breach of the other. Neither covenant is breached until there is an eviction under paramount title. The eviction may be either actual or constructive.

452 So.2d at 485 (citations omitted).

■ Liability under either covenant is however restricted as privity of estate between the grantor and the remote grantee is a prerequisite to recovery. *Blaum v. May,* 245 Ala. 156, 158, 16 So.2d 329, 331

(1944). Writing for the same court in *Deason v. Findley*, 145 Ala. 407, 408, 40 So. 220 (1906), Justice John C. Anderson explained:

> It is not sufficient that the covenant is concerning land, but to make it run with the land there must be a privity of estate between the covenanting parties, and the covenant must have relation to an interest created or conveyed, in order that the covenant may pass to the grantee of the covenantee. In order to entitle one to recover on a covenant of warranty of a remote vendor, the plaintiff must show that he holds title by privity with the immediate covenantor of such remote vendor.

145 Ala. at 408, 40 So. 220 (citations omitted).

In the context of the above, the term "privity" means "mutual or successive relationship to the same right of property; for example, the executor is in privity with the testator, the heir with the ancestor, the assignee with the assignor, the donee with the donor, and the lessee with the lessor." *Dinkins v. Latham*, 202 Ala. 101, 104, 79 So. 493, 496 (Ala.1918). "[T]o constitute one in privity of estate with another, such other must be a predecessor in respect to the property in question from whom the privy derives title." *Skelton v. Tyner*, 247 Ala. 511, 513, 25 So.2d 160, 161 (1946). " 'To be a privy to another, a man must claim by or under that other by blood, as heir, by representation, as executor, or by contract, as vendee, assignee, and the like; and a privy must come after him to whom he is privy, and never precedes.' " *Rowe v. Johnson*, 214 Ala. 510, 512, 108 So. 604, 606 (1926) (quoting *Crutchfield's Heirs v. Hudson*, 23 Ala. 393, 400 (1853)).

In this case, as in all similar, legal title of a mortgagee is derived from the mortgage deed executed by the mortgagor. By purchasing at its own foreclosure sale, a mortgagee acquires no title different or greater than it had by virtue of the original mortgage deed, but merely extinguishes the equity of redemption of the mortgagor or the mortgagor's assignee. In *Mallory v. Agee*, 226 Ala. 596, 147 So. 881 (1932), the Supreme Court of Alabama held that a mortgagee, purchasing at its own foreclosure sale, does not become a bona fide purchaser entitled to protection against the superior equities of third persons arising subsequent to execution of the mortgage deed. Writing for the Court, Justice Arthur B. Foster stated:

> The only change between the parties as to their respective property rights which results from such a foreclosure is to destroy the equity of redemption, and bring into being a bare statutory right. This court has conceded that thereby he did not acquire any different status as a bona fide purchaser from that which he had as a mortgagee, but enjoyed the same protection.
>
> . . . .
>
> We merely incidentally as a premise refer to the principle established in Alabama that a mortgage on real estate passes to the mortgagee a fee-simple title, unless otherwise expressly limited.
>
> The mortgagor, before or after default, except by agreement, does not possess even the right of possession, as against the mortgagee. But, as to him, his right is the equity of redemption, which is a property right, but not the legal title.
>
> So that when the mortgage is foreclosed and the mortgagee becomes the purchaser, he does not by such purchase acquire a legal title. In so far as their respective property rights are concerned, such foreclosure merely destroys the equity of redemption, which is a substantial interest in the property created through equitable principles, and thereafter there remains only a statutory right in those persons for whom it is created by law. When the mortgagee buys at his own sale, a foreclosure deed is not necessary, nor other written instrument by which the title passes. Its effect is controlled by the fact of foreclo-

sure, and a certificate by the auctioneer is held in those cases to be sufficient evidence of such foreclosure.

In order that a purchaser of land shall be protected against equities of third persons, he must have acquired at the time of such purchase the legal title by warranty deed. As a mere equity, that he acquires must be subordinate to older equities, but annexed to it is the legal estate ... which gives him precedence.

It is clear that a mortgagee of land, when the mortgagor owns and thereby conveys a legal title, with covenants of warranty, becomes a bona fide purchaser if he has no notice of the equity claimed.

But when that same mortgage is foreclosed and he becomes the purchaser, by such foreclosure sale, he does not acquire a legal title, not already possessed by him, and there is lacking such element of his claim in order that he be protected by the foreclosure, when he is not protected by the mortgage.

. . . .

But when the mortgagee buys at his own sale, he cannot improve his status by including a warranty in the deed he makes or causes to be made to himself. It is true that the warranty in the mortgage operates in his favor, but such warranty dates from the execution of the mortgage, but not from the foreclosure.

So that conceding that as the foreclosure satisfied the mortgage debt bid at the sale, and such satisfaction constitutes a new consideration, the mortgagee foreclosure purchaser is still outside the rule of protection due to an innocent purchaser as to equities accruing after the execution of the mortgage, but superior to it, because he did not at such sale acquire the legal title by warranty deed.

226 Ala. at 599–600, 147 So. at 883–884 (citations and internal quotation marks omitted).

■ WSA, by virtue of the deed from Hexalon, acquired only an equity of redemption in the property. SWSC, in turn, acquired only an equity of redemption from WSA. By purchasing the property at foreclosure, the plaintiff did not acquire the equity of redemption from SWSC, because the foreclosure extinguished that equity of redemption. Since the plaintiff acquired nothing from SWSC in the foreclosure sale, it cannot be said that the plaintiff is in a successive relationship to the same right of property as WSA, or that WSA is a predecessor in respect to the property from whom the plaintiff derived title, or that the plaintiff claims title to the property by or under WSA. Consequently, there is no privity of estate between the plaintiff and WSA.[3] And because there is no privity of estate between the plaintiff and WSA, the plaintiff is not entitled to recover from WSA

---

3. The weight of authority on similar issues supports the conclusion that there is no privity between the plaintiff and WSA. Generally speaking, there is no privity between a mortgagee and those claiming through transfer from the mortgagor, at least absent express assumption of the mortgage debt. See *Keller v. Ashford*, 133 U.S. 610, 622, 10 S.Ct. 494, 33 L.Ed. 667 (1890); *Tamiami Inv Co v. Berk*, 57 F.2d 1034, 1035 (3rd Cir.1932), cert. denied, 287 U.S. 611, 53 S.Ct. 14, 77 L.Ed. 531 (1932); *Knapp v. Connecticut Mut. Life Ins. Co.*, 85 F. 329, 331 (8th Cir.1898); *Bankers Mortg. Corp. v. Jacobs*, 613 F.Supp. 1579, 1580–1581 (E.D.Va.1985); *Bennett v. U.S. Land, Title & Legacy Co.*, 16 Ariz. 138, 141 P. 717, 720 (1914); *Central Life Ins. Co. of Ill. v. Thompson*, 182 Ark. 705, 33 S.W.2d 388, 390 (1930); *McCown v. Nicks*, 171 Ark. 260, 284 S.W. 739, 742 (1926); *Merchants' Union Trust Co. v. New Philadelphia Graphite Co.*, 87 A. 1022, 1024 (Del.Ch.1913), aff'd, 92 A. 1084 (Del.1914); *Poore v. Rigsby*, 206 Ga. 66, 55 S.E.2d 547, 549 (1949); *Grant v. New York Life Ins. Co.*, 179 Ga. 50, 175 S.E. 253, 254 (1934); *Dennis v. Graham*, 159 La. 24, 105 So. 87, 88–89 (1925); *Frank v. Applebaum*, 270 Mich. 402, 259 N.W. 302, 303 (1935); *Schwonke v. Banister*, 83 A.D.2d 752, 443 N.Y.S.2d 513, 515 (App.Div.1981); *Walser v. Farmers' Trust Co. of Indianapolis, Ind.*, 126 Ohio St. 367, 185 N.E. 535, 538 (1933); *Durden v. Groce*, 159 S.W.2d 941, 944 (Tex.Civ. App.1941); *Hubard & Appleby v. Thacker*, 132 Va. 33, 110 S.E. 263, 266 (1922).

based on a breach of the covenants contained in the deed from WSA to SWSC.[4]

### 3. Reimbursement Required by an Implied Contract Between the Plaintiff and WSA.

As to the plaintiff's third contention, the Court finds that reimbursement is not required by an implied contract between the plaintiff and WSA. The plaintiff contends that WSA was personally liable for the taxes assessed against the property while WSA owned the equity of redemption to the property and that, because the plaintiff was compelled to protect its interest in the property by paying the tax debt left unpaid by WSA, the plaintiff is entitled to restitution from WSA for the sums expended to satisfy that debt. That position may be correct in some circumstances, but not here. For example, "A party compelled, in order to preserve his rights, to pay the debt of another, may recover the amount so paid from the person whose duty it was to pay the debt." *Ancora Corp. v. Miller Oil Purchasing Co.*, 396 So.2d 672, 677 (Ala. 1981). Similarly, the law implies an agreement to reimburse on the part of the defendant when the plaintiff has "been compelled to pay that for which the defendant was legally liable." *Mobile Light & R. Co.*

4. The parties did not offer, and this Court did not find, any authority that suggests that a mortgagee, after foreclosure, may recover from a remote grantee of the mortgagor's equity of redemption based on warranties made in the deed from the mortgagor to his grantee, or based on warranties made in a deed from one remote grantee of the mortgagor to his grantee. But even if the plaintiff could recover based on warranties contained in the deed from WSA to SWSC, any such recovery would be limited to the purchase money actually received by WSA from SWSC. In an action against a remote grantee for breaches of warranties of title and quiet enjoyment, damages may not exceed "the consideration paid for the conveyance by the defendant in the action." *St. Paul Title Ins. Corp. v. Owen*, 452 So.2d 482, 486 (Ala.1984). The plaintiff had the burden of "establishing by competent evidence the existence of an entitlement to damages and the amount of those damages." *Marcus v. Lindsey*, 592 So.2d 1045, 1046 (Ala.1992). The evidence proffered by the plaintiff on the subject was the deed from WSA to SWSC which recites that WSA received $1,000 from SWSC as consideration for the transfer. Absent other evidence, the consideration recited in a deed is prima facia evidence of the nature and amount of consideration received for the conveyance described in the deed. *Lipscomb v. Tucker*, 294 Ala. 246, 256, 314 So.2d 840, 848 (1975); *Hyatt v. Ogletree*, 31 Ala.App. 8, 11, 12 So.2d 397, 399 (1942), *cert. denied*, 244 Ala. 172, 12 So.2d 400 (1943). Since the evidence before the Court is that WSA received only $1,000 for the transfer to SWSC, even if the plaintiff could claim under the covenants contained in the deed from WSA to SWSC, all that it would be entitled to recover, as damages for the breach of those covenants, would be the $1,000.

In its complaint, the plaintiff did not specifically claim a breach of the warranty against encumbrances contained in the deed from WSA to SWSC and, for reasons in addition to those in the body of this opinion, this Court finds that the plaintiff is not entitled to do so. "[A] covenant against encumbrances is broken immediately upon making the covenant if [an encumbrance] is then outstanding, although there has been no ouster by the [encumbrancer] nor interference with the possession and use of the land by the owner." *Chicago, Mobile Dev. Co. v. G.C. Coggin Co.*, 259 Ala. 152, 160, 66 So.2d 151, 155 (1953) (parentheticals added). "And the covenant being then broken and the right to sue then matured, it is a personal right which the covenantee owns and does not pass merely by a conveyance of the land. It is not an appurtenant to the land." *Id.* Because the taxes had not been paid by WSA prior to the execution of the deed to SWSC, and had, for that reason become a lien against the property, the covenant against encumbrances was breached when the deed was delivered to SWSC. The right to sue for the breach of the covenant, therefore, rested with SWSC and could not pass to future grantees of the property. As shown in *Wolff v. Woodruff*, 258 Ala. 1, 6, 61 So.2d 69, 74 (1952), the conveyance of property will not pass a right to sue for the breach of a covenant which occurred prior to the conveyance.

But as explained above, even if the plaintiff had a right to sue for the breach, any damages awardable to the plaintiffs as the result of a breach of the covenant against encumbrance, would, in any event, be limited to $1,000, the consideration paid to WSA for the conveyance. *Hyatt v. Ogletree*, 31 Ala.App. 8, 11, 12 So.2d 397, 399 (1942), *cert. denied*, 244 Ala. 172, 12 So.2d 400 (1943).

*v. S.D. Copeland & Son*, 15 Ala.App. 235, 238, 73 So. 131, 132 (1916).

■ Where recovery is allowed in situations such as the ones described above, that is through of an implied contract, or quasi-contract, the remedy is usually "founded upon the familiar principle of avoiding unjust enrichment." *Opelika Production Credit Assoc., Inc. v. Lamb*, 361 So.2d 95, 99 (Ala.1978). In writing the opinion for the Alabama Supreme Court in *Opelika Production Credit*, Justice Janie L. Shores explained:

> Where the plaintiff has suffered a detriment, and the defendant has received a benefit as a result, it is said that justice demands the repayment by the defendant of the plaintiff's loss. The measure of the defendant's liability is, however, limited to the value of the benefit received, whether or not it is equal to, less than, or greater than the plaintiff's loss. But, in any case, there must be a detriment, and a resulting benefit, and the two must be related.

361 So.2d at 99. But as the Court in *Beard v. Horton*, 86 Ala. 202, 5 So. 207 (1889), explained, there *are* requisites for application of those standards. The opinion there roads in part:

> In order to enable one who paid money to the use of another to maintain an action for money paid, two things are essential, *a legal liability on the part of the defendant to pay the original demand, and his antecedent request or subsequent promise to pay*. No person can make another a debtor against his will, and a voluntary payment of the debt of another, without his knowledge or consent, the party paying being under no legal obligation to pay, will ordinarily be regarded a gratuity, and the money paid cannot be recovered back. An express request or promise is not essen-

> tial. If the party paying is under a legal obligation to pay, and a primary obligation rests on the person for whose benefit the money is paid, a request or promise, sufficient to uphold the action, will generally be implied.

86 Ala. at 204, 5 So. at 208 (emphasis added).

Consequently, for this Court to find that the plaintiff is entitled to restitution for the amount paid to satisfy the tax debt on the property, this Court must find that WSA must have been under a *legal obligation to pay the taxes*. To make that determination, this Court has considered the differences in the Alabama statutes that control real property tax assessments.

Alabama statutes specify two procedures for assessing real property taxes. One group of statutes provide for a general taxing method applicable to all counties in the state with a population of *under 500,-000*. See Code of Ala., 1978, § 40–7–1 et seq. The other group of statutes provides for use of the "unit system of assessment," (based on a currently uncodified statute) for use by tax assessors in all counties in the state with a population of *over 500,-000*.[5] See Act of April 21, 1936, No. 176, 1936 Ala. Acts Ex.Sess. 205; Act of February 2, 1937, No. 48, 1936–37 Ala. Acts Ex.Sess. 34; Act of September 15, 1961, No. 231, 1961 Ala. Acts Ex.Sess. 2241 (formerly codified as Code of Ala., 1951, §§ 78–87).[6]

In the opinion of the Supreme Court of Alabama in *Phillips v. Hinkle*, 262 Ala. 330, 78 So.2d 800 (1955), the key difference between the methods is that the general statutes make the owner (of the property assessed) personally liable for taxes where the specific unit system does not. Writing for the Court, Justice Davis F. Stakely explained:

> by virtue of Code of Ala.1975, § 1–1–10 and amendment no. 386 to the Alabama Constitution.

---

**5.** The population limits were initially 200,000, but were amended over time.

**6.** The unit system of assessment act, even though not presently codified, is still in effect

There is a fundamental difference between the general taxing statutes set forth in § 31 et seq., Title 51, Code of 1940, and the unit system of assessment statutes set forth in § 78 et seq., Title 51, Code of 1940. Under the general taxing statutes taxes assessed against property are regarded not only as a lien in rem, but also as a personal debt due from the owner and collectible by personal action. Under the unit system of assessment statutes as set forth in § 78 et seq., Title 51, where the assessment is made by the taxing authorities, the assessment and levy of taxes against the land is a proceeding only in rem.

262 Ala. at 335, 78 So.2d at 803 (citations omitted).

 Because the property involved in this case is located in Jefferson County, Alabama, a county with a population of over 500,000, the property is subject to the unit system of assessment statutes. As such, and based on the statutes intended application, the assessor in Jefferson County would have been required to utilize that system of assessment in assessing the subject property.[7] And this Court is enti-

---

7. The first section of the act establishing the unit system of assessment for the qualifying counties reads:

> The purpose of this chapter is to provide for a more convenient, economical and uniform system of assessing and collecting taxes on real estate by *authorizing* the tax assessing authority in counties having a population of five hundred thousand or more ... to assess each lot or parcel of land separately to the owner last assessing said property or to the owner of record and annually thereafter under a unit system of assessment of real property....

Former Code of Ala., 1951, § 78 (emphasis added).

The section of the act that describes *the method* of assessing taxes under the unit system provides that "the tax assessor shall have the *right and authority* ...." to utilize the unit system of assessment. Former Code of Ala., 1951, § 80 (emphasis added). Because those statutes, by their terms, do not *command* or *compel* any tax assessor to use the unit system of assessment, this Court was required to determine whether tax assessors who are authorized to use the unit system, must use that system or may elect to assess taxes under a different methodology such as that provided for under the general taxing statutes applicable to smaller counties. Or, in other words, are the statutes mandatory or discretionary?

The distinction is important in regards to the immediate case. If unit system statutes are *discretionary*, resolution of the restitution issue here will require *evidence* regarding the methodology employed in assessing the taxes involved in this case, since no evidence is presently before the Court on the subject. On the other hand, if the statutes are *mandatory*, this Court may, as a matter of evidence, presume that the taxes were assessed in the manner required by the statutes. See note 8.

As way of background, this Court understands that the manner or method of assessing taxes has a direct impact on the cost and efficacy of the administration of state government and on the amount and nature of the liability imposed on *individual taxpayers*. Consequently, the public as a whole, and individual taxpayers as well, have the right to see that taxes are fairly and uniformly assessed in accordance with statutes. "It has so often been decided as to have become an axiom of statutory construction that, where the authority is conferred to do something for the public good or the advancement of justice, compulsory force will be given the statute, notwithstanding the use of permissive words." *Conecuh County v. Carter*, 220 Ala. 668, 669, 126 So. 132, 133 (1930). "It is a legal, or rather a constitutional principle, that powers given to public functionaries or others for public purposes or the public benefit, are always to be exercised when the occasion arises." *Id.* (citations and internal quotation marks omitted). "In other words, a mandatory construction will be given to the word "may" where public interests are concerned, and the public or third persons have a claim de jure that the power conferred should be exercised, or whenever something is directed to be done for sake of justice or public good." *Fuller v. State*, 31 Ala.App. 324, 326, 16 So.2d 428, 430 (1944). "Where the word "may" is used in conferring power on officer, or court, language is mandatory, and must be strictly obeyed, where rights of public or third party are affected." *Id.*

The unit system statutes were enacted by the Alabama Legislature to provide for and define the appropriate methodology of assessment to be employed by tax assessors in the state's largest counties. But if application of the unit system of assessment is discretionary, succeeding tax assessors could, without reason, change methods of tax assessment. The tax assessor serving during one term might elect the unit system of assessment while the tax assessor elected for the next

term might discard the unit system and employ the generally applicable system. Chaotic administration of the assessment and collection of property taxes and inconsistent treatment of taxpayers would occur. It is therefore unlikely that the Legislature would have drawn an act of such limited application had it understood that the act could be ignored by any tax assessor in those counties who might thereafter be elected to that position.

In reaching its resolution of this issue, this Court must be guided by the principle that where "a statute is susceptible of two constructions, one of which is workable and fair and the other unworkable and unjust, the court will assume that the legislature intended that which is workable and fair." *Karrh v. Board of Control of the Employees' Retirement System of Alabama*, 679 So.2d 669, 671 (Ala. 1996) (quoting *Ex parte Hayes*, 405 So.2d 366, 370 (Ala.1981) (quoting *State v. Calumet & Hecla Consol. Copper Co.*, 259 Ala. 225, 233–34, 66 So.2d 726, 731 (1953))). When that principle is applied here, this Court must ask, if the application of the unit system of assessment were discretionary, would a tax assessor then be free to impose or "make-up" any system of assessment or even be free to disregard either statute? Of course not. While it is clear that there is no language in the statute that specifies an alternative method of assessment or requires the Jefferson County tax assessor to employ the method of assessment applicable in smaller counties, there is in fact nothing in the statute that specifically requires the tax assessor even to make assessments. In other words, if an assessor can pick methods because the statute does not "command" a particular choice, the same topic will allow the words "authorizing," "right," and "authority" to mean that a tax assessor could, with discretion, elect to make no assessment at all. Certainly, that was not the intended result. Neither the tax assessor nor "[t]he legislature, itself, can act in an arbitrary or capricious manner. It inevitably follows that the legislature cannot delegate power to any person or authority to be exercised arbitrarily or capriciously." *Druid City Hospital Board v. Epperson*, 378 So.2d 696, 699–700 (Ala.1979) (citations omitted).

This Court is also guided by the principle that, "The statutes presenting a comprehensive system for affording the public revenue are contained in the Code and in the revenue statutes not so included. The governmental policy as to such matters is to be found in these legislative acts on the same subject and construed together in pari materia as a part of one system." *Union Central Life Ins. Co. v. State ex rel. Whetstone*, 226 Ala. 420, 422–423, 147 So. 187, 189 (1933). The general property tax statute applicable to tax assessors in counties with populations less than 500,000 contains the same facially permissive language as do the unit system statutes. "The tax assessor or other assessing official in each of the several counties shall have the *right* and *authority* to assess all real estate, together with improvements thereon, and all personal property...." Code of Ala., 1975, § 40–7–1 (emphasis added). If the unit system statute is, by use of the same terms, discretionary then, by the same logic, so is the general assessment statute. That conclusion, if correct, would mean that every tax assessor in the state would be free to ignore the assessment of taxes. Of course, nothing is farther from the truth; tax assessors must assess taxes in accordance with the statutes and mandamus is available to force them to do so. *Carter v. State ex rel. Bullock County*, 393 So.2d 1368, 1370 (Ala.1981). If the unit system law is construed in pari materia with the general assessment law, logic dictates that, if the general real property tax law (which uses the same language as appears in the unit system statutes) is mandatory in the counties in which it applies, then the unit system law is likewise mandatory in the counties in which it applies.

This conclusion, if not mandated by the decision of the Supreme Court of Alabama in *Dearborn v. Johnson*, 234 Ala. 84, 173 So. 864 (1937), is certainly bolstered. In *Dearborn*, the plaintiffs challenged the constitutionality of the unit system act on the grounds that it denied due process because it did not specify procedures for hearing and appeal by the taxpayer after protest. The court held that the act did not deny due process because provisions of the general revenue statutes for hearing and appeal augmented the act and could be employed to seek review of taxes assessed under the unit system. Writing for the Court, Justice Lucien D. Gardner stated:

Nor do we think the invalidity of this act is to be rested upon the theory of a denial of due process of law. Our cases recognize, in line with the authorities generally, that the due process clause of the Constitution (section 6) is applicable to tax proceedings, and it was so declared by this court in *State Tax Commission v. Bailey & Howard*, 179 Ala. 620, 60 So. 913; *State Tax Commission v. Tennessee Coal, Iron & R. Co.*, 206 Ala. 355, 89 So. 179. It only remains to ascertain what is necessary to meet the requirements of due process.

The property owner is aware of the fact that his property is subject to taxation. The assessment list, as prepared by the assessor, under the act here considered, will disclose the description of the property, to whom it was assessed, and the valuation thereof the year preceding. The board of review, to whom the list is delivered, then fixes the

tled to presume that the tax assessor did

valuation. If there is no increase in valuation, the owner will know there has been no raise in the matter of assessment. But the act expressly provides that "in the event the Board of Review raises the assessed value of any property, notice of such raise shall be given to the party to whom said property was assessed." Gen.Acts 1936, Ex.Sess., p. 206, § 5. And in the Bailey and Howard Case, supra, the holding was that if the previous assessment valuation of his property was not raised, and his tax thereby increased, he suffered no damage and therefore has nothing of which to complain. See, also, 26 R.C.L., § 306; 61 Corpus Juris, § 692.

But there is a broader view that likewise answers complainant's contention. Section 5 of the act makes specific provision for a protest by the owner before the board of review as to the valuation placed on the property, with time fixed for such hearing. *The act here in question only repeals so much of the general Revenue Code as conflicts therewith, leaving unaffected those applicable provisions not specifically treated. The act is in fact auxiliary to the Revenue Code.* Among the provisions unaffected are the place of hearing at the courthouse and the right of the taxpayer to appeal within a given time to the circuit court from the ruling of the board, and a further appeal from the circuit to the Supreme Court. Sections 77 and 78, Revenue Code (Gen. Acts 1935, p. 294, §§ 77, 78). By law, therefore, the time and place of the meeting of the board of review is fixed with the right of full hearing in open session.

234 Ala. at 89, 173 So. at 867–868 (emphasis added).

According to *Dearborn*, the unit system act repealed those provisions of the general statutes that conflicted with it. And that unit system act specifically provides for the assessment of taxes by use of the unit system. Therefore, in counties under the unit system act where the provisions of the general revenue statutes providing for the assessment of taxes in a manner different from that provided for in the unit system act, those provisions have been repealed.

Since no statutorily method of tax assessment was available to the tax assessor who assessed the taxes *involved in this case* other than the unit system of assessment, the conclusion is unavoidable that because the taxes were in fact assessed, that the taxes were in fact assessed in accordance with the unit system of assessment. If this Court were to accept that the taxes were assessed otherwise, this Court would be required to accept that

so.[8]

the taxes were assessed *without any statutory authority.*

8. Ordinarily, we presume that public officials have " 'properly discharged their official duties.' " *Bracy v. Gramley*, 520 U.S. 899, 909, 117 S.Ct. 1793, 1799, 138 L.Ed.2d 97 (1997) (quoting *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926)), and that administrative agencies "will act properly and according to law." *F.C.C. v. Schreiber*, 381 U.S. 279, 296, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965). We also presume that "Acts done by a public officer 'which presuppose the existence of other acts to make them legally operative, are presumptive proofs of the latter.' " *R.H. Stearns Co. of Boston, Mass. v. United States*, 291 U.S. 54, 62, 54 S.Ct. 325, 78 L.Ed. 647 (1934). This "presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 15, 47 S.Ct. 1, 71 L.Ed. 131 (1926). "[A]ll necessary prerequisites to the validity of official acts are presumed to exist, in the absence of evidence to the contrary." *United States v. Royer*, 268 U.S. 394, 398, 61 Ct.Cl. 1030, 45 S.Ct. 519, 69 L.Ed. 1011 (1925), and "Members of the public are entitled to assume that public officials will act in accordance with law." *Buccaneer Point Estates, Inc. v. United States*, 729 F.2d 1297, 1299 (11th Cir.1984).

For example, "It will be presumed that the [Interstate Commerce] Commission properly performed its duties. This presumption attaches in the absence of clear evidence to the contrary." *United States v. Central Truck Lines, Inc.*, 548 F.2d 523, 524 (5th Cir.1977); "[I]t is a presumption of law that a public officer will faithfully perform his duty." *Continental Bank & Trust Co. v. Brandon*, 297 F.2d 928, 932 (5th Cir.1962); "[T]he presumption [is] that public officials do their duty." *Board of Public Instruction for Brevard County v. Osburn*, 101 F.2d 919, 922–923 (5th Cir.1939); "It is the well settled principle that in the absence of clear proof to the contrary, public officers are presumed to have performed their statutory duties in respect to the conveyance of lands bought in by the state at tax sale." *Charles B. Teasley, Inc. v. Dreyfus*, 252 Ala. 41, 45–46, 39 So.2d 377, 380 (1949); and, "There is a presumption that public officials have discharged their duty, nothing to the contrary appearing." *Edwards v. Hosey*, 251 Ala. 298, 302, 36 So.2d 904, 907 (1948).

■ Therefore, in application of *Phillips v. Hinkle*, this Court must find that WSA cannot be personally obligated to pay the taxes. The assessment constituted only an in rem claim against the property. It did not create a personal debt. Consequently, this Court must conclude that WSA had no legal obligation to pay the taxes and received no benefit as a result of the plaintiff's payment of those taxes.[9] Therefore, the plaintiff is not entitled to restitution or reimbursement of the sums under a theory of implied contract.[10]

9. This Court held the opinion at one time that the issue of *whether or not the taxes were assessed under the unit system or some other method of assessment* might be a material issue of fact and notified the parties of those misgivings. No evidence on the subject, however, was proffered by either party. Upon further consideration, the Court finds that no specific evidence was or is necessary as the evidentiary presumption described in the foregoing cases, and common sense application of that presumption, fills the void in the parties' proof regarding the method employed to assess the taxes. And since no evidence has been presented to rebut the reasonable presumption that the taxes were indeed assessed in accordance with the unit system of assessment, the presumption stands and resolves the issue. Therefore, there is no material issue of fact regarding this issue and summary judgment may be considered.

10. In *Griffin Lumber Co. v. Neill*, 240 Ala. 573, 200 So. 415 (1941), local assessments were made against property pursuant to municipal ordinances for street and sewer improvements. The entity in possession of the property when the assessments were made was a grantee of the mortgagor's equity of redemption who did not assume the mortgage obligation. Neither the non-assuming grantee nor the mortgagee paid the assessments and the property was, consequently, sold for nonpayment. The city purchased the property at the sale. After the time for redemption from the sale had passed, the non-assuming grantee purchased the property from the city. The mortgagee subsequently foreclosed her mortgage and purchased title to the property at the foreclosure sale. The non-assuming grantee filed an action to quiet title claiming superior right to the property by virtue of its purchase from the city. The question before the trial judge was "whether the purchaser of the equity of redemption can defeat the lien of the mortgage by the acquisition of the title of the City of Birmingham, when such title in the City was created by the default in duty of payment of municipal assessments by the purchaser." 240 Ala. at 575, 200 So. at 417. The trial judge ruled in favor of the mortgagee, holding "that the acquisition of such title is but the payment of the tax or assessment, or a redemption from the sale so far as the mortgagee is concerned, and that the mortgagor or his grantee cannot set up such title against the prior mortgage." *Id.*

The Supreme Court of Alabama reversed. Noting that the rule relied upon by the trial judge "is based on the principle that one cannot acquire a title through his own default to the prejudice of the mortgagee," *id.*, the court concluded that the non-assuming grantee had not, in fact, acquired title to the property through its default of any legal duty owed either under the law or to the mortgagee. The non-assuming grantee owed no duty to the mortgagee to pay the assessments since it was not a party to the mortgage instrument, which contained covenants requiring the payment of such assessments by the mortgagor. And the non-assuming grantee owed no duty under the law to pay the assessments because, under Alabama law, local assessments, unlike property taxes, are not personal obligations of the property owner but are only enforceable as liens against the property assessed. Writing for the Court, Justice Virgil Bouldin stated:

This is a correct statement of the law applicable to tax sales resulting from failure of the mortgagor in possession, or his successor in possession and ownership, to pay the state and county taxes on the property. He has a legal duty to pay such taxes. He is personally indebted to the state and county therefor. The rule is based on the principle that one cannot acquire a title through his own default to the prejudice of the mortgagee. The latter has a right to depend upon the mortgagor, or one standing in his position, to pay the taxes. One cannot take advantage of his own breach of duty.

But local assessments by a city for public improvements, under our law, are liens against the property only. They are betterment taxes, limited to the special benefits arising from the improvements. They are not personal obligations of the owner, either mortgagor or mortgagee. Each of them has a right to pay the assessment for the protection of his property interest, but neither is under any legal obligation to pay the assessment for the protection of the other, unless by contract stipulation.

The liens in favor of the city are superior to all other liens, except liens of the state

## B. Fitzpatrick Revisited

### 1. The "mortgage instrument or assumption" issue.

#### a. The plaintiff's summary judgment motion should be denied.

On the issue of whether or not the plaintiff is entitled to reimbursement by virtue of the mortgage instrument, the plaintiff failed to support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. The only evidence submitted by the plaintiff was the mortgage instrument and the deed from Hexalon to WSA. WSA is not a party to the mortgage instrument and the deed from Hexalon contains no language that suggests that WSA assumed or agreed to abide by any terms of the mortgage. Consequently, on that issue the plaintiff's motion for summary judgment is due to be denied.

#### b. The defendants' summary judgment motion should be granted.

To the contrary, the evidence the defendants submitted on the same issue in addition to the deed from Hexalon, was the affidavit of Mr. Bienenstock, in which he expressly states that WSA did not assume the mortgage. That evidence affirmatively negates the plaintiff's allegation that WSA is responsible for the taxes by virtue of the mortgage. That evidence further demonstrates that the plaintiff will be unable to prove its case at trial. In response to the evidence submitted by the defendants on the issue, the plaintiff submitted the mortgage and the Hexalon deed. Evidence consisting of those two documents would not withstand a directed verdict motion by the defendants at trial. Consequently, on that issue the defendants' motion for summary judgment is due to be granted.

and county for taxes. They attach to the full title, that of the mortgagee and mortgagor. Valid assessments followed by valid sales in their enforcement pass to the city all the title of mortgagor and mortgagee, subject to the rights of redemption provided by law.

After the expiration of the time for redemption the city has a good and complete title. Under general principles of law, he who has a good title may pass a good title.

Granting the city acquired a good title against the mortgagee, the only ground on which the title of complainant can be questioned is some breach of duty toward the mortgagee rendering it inequitable for him to acquire the title of the city as against the mortgagee. A species of estoppel arises in the latter event. No such estoppel arises for nonpayment of these assessments, for the reason that he owed no duty to the mortgagee to pay them. We conclude he had the same right to purchase from the city as any other person.

We do not overlook the fact that the mortgagor, Pilcher, covenanted with the mortgagee to pay assessments as well as taxes for the protection of the mortgagee; and further stipulated that on default, the mortgagee could pay and such outlay become a part of the mortgage debt. Such covenant had the effect to burden the

mortgagor's equity of redemption with these assessments, and upon payment by the mortgagee, constitute same a part of the mortgage debt. She did not pay same. Complainant took the equity of redemption so burdened, but he was not the covenantor, had no contractual relations with the mortgagee, and was under no personal obligation to pay these assessments.

We are of opinion complainant stood in no such relation to the mortgagee as to disqualify him to purchase the city's title. He took that title as any other purchaser from the city would have done.

240 Ala. at 575–576, 200 So. at 417 (citations omitted).

The principals of *Griffin Lumber Co.* are applicable to the issues in this case. WSA had no personal legal obligation to pay the particular taxes assessed against the property under the unit system of taxation. Also, WSA was not a party to the mortgage, did not assume the obligations under the mortgage, and was not otherwise in privity with the plaintiff perforce either the obligations contained in the mortgage to pay taxes or the real property covenants contained in the mortgage. Since WSA had no legal duty, by virtue of any contract, or under the law of this state, to pay the taxes, no contract to reimburse the plaintiff for the payment of those taxes may be implied.

## 2. The breach of warranties or covenants issue.

### a. The plaintiff's summary judgment motion should be denied.

On the issue of whether or not reimbursement is required by warranties made in the deed from WSA to SWSC, the plaintiff failed to support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. The plaintiff submitted and relies on the documents forming the chain of title of the property. While the language in one of those documents, that is the deed from WSA to SWSC, created covenants of quiet enjoyment and warranty, the other documents submitted by the plaintiff clearly reflect that the plaintiff is not in privity with WSA, and, therefor, may not claim damages for breach of those covenants. Consequently, on that issue the plaintiff's motion for summary judgment is due to be denied.

### b. The defendants' summary judgment motion should be granted.

Because of the lack of privity apparent on the face of those document, the defendants' rely on the same documents. Those documents affirmatively negate the plaintiff's allegation that WSA is required to reimburse the plaintiff by the covenants contained in the deed from WSA to SWSC. Furthermore those documents demonstrate that the plaintiff will be unable to prove its case at trial, as the evidence in those documents would not withstand a directed verdict motion by the defendants at trial. Consequently, on that issue the defendants' motion for summary judgment is due to be granted.

## 3. The restitution or implied contract issue.

### a. The plaintiff's summary judgment motion should be denied.

On the issue of whether or not restitution is required under a theory of implied contract, the plaintiff failed to support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. In support of its summary judgment motion on this issue, the plaintiff relies on the documents attached to the joint stipulation and the affidavit of Eric Breithaupt. To establish an essential element for recovery under implied contract, the plaintiff is required to prove that the defendants had a legal obligation to pay the taxes. The statute under which the taxes were assessed has been construed by Alabama courts as not imposing personal liability on the taxpayer for payment of real property taxes for property so assessed. Under that statute, the evidence relied on by the plaintiff, even if uncontroverted at trial, would not entitle the plaintiff to recover and could not, for that reason, withstand a motion for directed verdict by the defendant.[11] Conse-

---

11. For the same reason, the analogous equitable remedy of subrogation would not be helpful to the plaintiff. The right of "subrogation arises when the person seeking the aid of that rule has paid a debt due by another to a third person, and that the former (prior to payment) sustains a relation to that debt or property obligation which makes it necessary to pay the same to protect his claim or lien." *Strickland v. Carroll*, 228 Ala. 498, 499, 154 So. 109, 110 (1934). One entitled to subrogation "stands in the shoes of the creditor and is entitled to the benefit of all the remedies of the creditor and may use all means which the creditor could to enforce payment." *Crutchfield v. Johnson & Latimer*, 243 Ala. 73, 75, 8 So.2d 412, 414 (1942). However, he "must work through the creditor whose rights he claims," and "can only enforce such rights as the creditor could enforce, and must exercise such rights under the same conditions and limitations as were binding on the creditor, and hence, can be subrogated to no greater rights than the one in whose place he is substituted." *Id.* He cannot acquire by subrogation any greater rights than those possessed by the secured creditor whose claim he paid. *American Bonding Co. of Baltimore v. Fourth Nat'l Bank of Montgomery*, 205 Ala. 652, 656, 88 So. 838, 842 (1921). For purposes of subrogation, the plaintiff, by paying the tax debt, stands in the shoes of the taxing authorities. Since the taxing authorities could not recover the tax debt from WSA but instead were limited in recourse to the property for collection of the debt, the plaintiff is likewise limited.

quently, on that issue the plaintiff's motion he for summary judgment is due to be denied.

### b. The defendants' summary judgment motion should be granted.

The defendants, in support of their motion for summary judgment on the same issue, rely on the same statute and thus have demonstrated that the plaintiff will be unable to prove its case at trial. The initial burden under *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993) was satisfied by the defendants, consequently, the responsibility shifted to the plaintiff to show the existence of a genuine issue of material fact. Certainly, it is difficult to see how the plaintiff could avoid the operation of the statute, unless proof was submitted that the taxes were not assessed in accordance with the statute. But even assuming such proof is available, and would, if uncontroverted, entitle the plaintiff to a directed verdict at trial, it has not been offered. And since the plaintiff has not, in response to the defendants' motion, submitted evidence that would preclude a directed verdict for the defendants at trial on the issue, on that issue the defendants' motion for summary judgment is due to be granted.[12]

---

**12.** If WSA had been personally liable for the taxes, would Alabama law have mandated restitution? That issue is not before the Court and resolution of it is not necessary to the outcome of this case. To this Court's knowledge, neither the Supreme Court of Alabama nor the Alabama Court of Civil Appeals has specifically addressed the issue of whether a mortgagee, subsequent to foreclosure, may redeem the mortgaged property from a tax sale and then pursue an independent action against the mortgagor for recovery of the amounts paid to redeem the property. At first glance, it would seem that the question might easily be answered in the affirmative in accordance with the general tenants of Alabama law regarding mortgage deficiencies and restitution, however a cursory review of cases from other jurisdictions might lead one to consider the question a bit more carefully. The majority rule from other jurisdictions is:

> that, as the amount paid for taxes, together with the amount due under the mortgage, constitutes but a single and indivisible demand, existing only by virtue of the mortgage, and being collateral and subordinate thereto, it cannot be separated and collected in a separate action: therefore, a mortgagee who has paid taxes on the encumbered property, either before or after the foreclosure of his mortgage, to protect his interest therein, cannot, after the foreclosure of the mortgage, maintain an independent action against the mortgagor to recover the amount so paid, since such payment does not create a lien or liability apart from that of the mortgage, and since a satisfaction of the latter cancels and terminates all liability on the part of the mortgagor to reimburse the mortgagee therefor.

Annotation, *Right and Remedy of Mortgagee Who for the Protection of His Security Pays Taxes on, or Redeems from Tax Sale of, Mortgaged Property*, 84 A.L.R. 1366, 1387 (1939), supplemented by 123 A.L.R. 1248, 1256. *See also Gilmour v. First Nat'l Bank of Central City*, 21 Colo.App. 301, 121 P. 767, 768 (1912); *Hillsborough Inv. Co. v. City of Tampa*, 149 Fla. 7, 5 So.2d 256, 258 (1941); *Home Owners' Loan Corp. v. Joseph*, 306 Ill. App. 244, 28 N.E.2d 330, 332–333 (1940); *Massachusetts Hospital Life Ins. Co. v. Shulman*, 299 Mass. 312, 12 N.E.2d 856, 858 (1938); *Vincent v. Moore*, 51 Mich. 618, 17 N.W. 81 (1883); *Pulsifer v. Paxton*, 212 Minn. 68, 2 N.W.2d 427, 428 (1942); *Stallings v. Erwin*, 148 Mont. 227, 419 P.2d 480, 481–482 (1966); *Johnson v. Payne*, 11 Neb. 269, 9 N.W. 81, 82 (1881); *First Carolinas Joint Stock Land Bank of Columbia v. McNiel*, 177 S.C. 332, 181 S.E. 21, 25 (1935); *Smart v. Tower Land and Investment Co.*, 597 S.W.2d 333, 339 (Tex.1980); *Stone v. Tilley*, 100 Tex. 487, 101 S.W. 201, 202 (1907); *Jackson v. Stonebriar Partnership*, 931 S.W.2d 635, 638–639 (Tex.App.1996); *Henry S. Miller Co. v. Wood*, 584 S.W.2d 302, 305 (Tex.Civ.App. 1979), *aff'd*, 597 S.W.2d 332 (Tex.1980); *Hewey v. Richards*, 116 Vt. 547, 80 A.2d 541, 542–543 (1951); *National Bank of Washington v. Equity Investors*, 86 Wash.2d 545, 546 P.2d 440, 448–449 (1976). *Contra Land Title Bank & Trust Co.*, 20 F.Supp. 810, 811 (E.D.Pa.1937); *First Nat'l Bank of Ashley v. Reily*, 165 Pa.Super. 168, 67 A.2d 679, 680 (1949).

Similarly, to the Court's knowledge, the Alabama appellate courts have not specifically addressed the issue of whether a mortgagee, subsequent to foreclosure, may redeem the mortgaged property from a tax sale and then pursue an independent action against a non-assuming grantee of the mortgagor for recovery of the amounts paid to redeem the property. In general, courts addressing the issue have concluded that the mortgagee is not

## V. Conclusion

The Court has considered all pleadings, affidavits, exhibits, and memorandum submitted by the parties. And as it is required to do, this Court has resolved all reasonable doubts about the facts contained in those documents in favor of the plaintiff and has drawn all justifiable inferences from the facts contained in those documents in the plaintiff's favor. Nevertheless, the Court finds that there are no genuine issues as to any material facts and that the defendants' are entitled, under Rule 56(c) of the Federal Rules of Civil Procedure (applicable to this matter through Rule 7056 of the Federal Rules of Bankruptcy Procedure) to judgment as a matter of law. A separate order will be entered in accordance with this memorandum opinion.

entitled to restitution in that circumstance. *Lincoln Savings Bank v. Hayes*, 671 F.2d 198, 201–204 (6th Cir.1982); *Camden Trust Co. v. Handle*, 132 N.J. Eq. 97, 26 A.2d 865, 872 (1942); *Citizens Sav. Bank v. Guaranty Loan Co.*, 62 R.I. 448, 6 A.2d 688, 691–692 (1939); *Kimball v. McGowan*, 65 R.I. 500, 16 A.2d 500, 501 (1940); *Praetorians v. State*, 53 S.W.2d 334, 335 (Tex.App.1932); *State–Planters Bank and Trust Co. v. Pollard & Bagby Investment Corp.*, 186 Va. 217, 42 S.E.2d 287, 290–291 (1947). Had the "implied contract" issue not been resolvable on the basis of

WSA's lack of personal responsibility for the tax debt paid by the plaintiff, certification of the question of the plaintiff's right to obtain restitution from WSA to the Supreme Court of Alabama may have been necessary. "Where there is any doubt as to the application of state law, a federal court should certify the question to the state supreme court to avoid making unnecessary *Erie* 'guesses' and to offer the state court the opportunity to interpret or change existing law." *Mosher v. Speedstar Div. of AMCA Intern.*, 52 F.3d 913, 916–917 (11th Cir.1995) (citation omitted).